**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas Joe PEARSON, Defendant–Appellant.**

**No. 03–30441.**

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 3, 2004.*

Filed Dec. 14, 2004.

Steven Richert, Federal Defenders of Eastern Washington and Idaho, Pocatello, ID, for the defendant-appellant.

Michael J. Fica, United States Attorney's Office, Pocatello, ID, for the plaintiff-appellee.

Before ALARCÓN, FLETCHER, and RAWLINSON, Circuit Judges.

ALARCÓN, Circuit Judge.

Thomas Joe Pearson appeals from the judgment of conviction following a trial by jury. He was convicted of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g) and 924(a)(2), as

---

* This panel finds this case appropriate for submission without oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(2).

charged in Count One of the indictment, of the possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d), as charged in Count Two, of the possession of an unidentified firearm in violation of 26 U.S.C. § 5861(h), as charged in Count Three, of the possession of methamphetamine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 846, as charged in Count Four, and the use of a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c), as charged in Count Five.

His appeal is limited to the denial of his motion for a judgment of acquittal regarding the crimes set forth in Count Four and Count Five of the indictment. He alleges that the evidence is insufficient to demonstrate that he possessed methamphetamine with the intent to distribute it to the woman with whom he cohabited because they attempted to acquire it to consume it jointly and simultaneously. He also maintains that his conviction of using a firearm in relation to a drug offense may not stand because of the insufficiency of the evidence that he attempted to possess methamphetamine with the intention to distribute it.

We affirm because we conclude that the evidence is sufficient to demonstrate that he attempted to possess methamphetamine to distribute it to his live-in companion.

I

The prosecution's evidence concerning the events that led to Mr. Pearson's conviction of Count Four and Count Five was presented through the testimony of Steven Gill. It was corroborated by Mr. Pearson's post-arrest admissions. Mr. Gill testified that on the evening of May 10, 2002, he and Jose Lucio were seated in a truck outside a convenience store in Blackfoot, Idaho when Mr. Pearson and Victoria Fresh approached them. Mr. Gill testified that Mr. Pearson knew Mr. Lucio.

Mr. Pearson asked Mr. Gill and Mr. Lucio if they knew where "to get any crystal." Both Mr. Gill and Mr. Lucio were distributors of methamphetamine. They agreed to acquire methamphetamine for Mr. Pearson. Mr. Lucio responded that they would meet Mr. Pearson at his residence to enable him to obtain the money to acquire methamphetamine. Ms. Fresh said nothing during this encounter with Mr. Gill and Mr. Lucio.

Mr. Pearson and Ms. Fresh walked to their residence. Mr. Gill and Mr. Lucio drove there in the truck.

Mr. Lucio entered the apartment with Mr. Pearson and Ms. Fresh. Mr. Gill remained in the truck. After about ten minutes, Mr. Lucio returned alone and told Mr. Gill that Mr. Pearson insisted on accompanying them to acquire the methamphetamine. Mr. Lucio and Mr. Gill then agreed that they would "rip him off," get him out of the truck, and leave with his money.

After Mr. Pearson got in the truck, Mr. Gill drove around for a minute and dropped Mr. Lucio off at a corner. Mr. Lucio stated he would call Mr. Gill when he acquired the methamphetamine. After driving around for a while, Mr. Pearson became angry because Mr. Lucio had not called to tell Mr. Gill where to pick him up. Mr. Pearson told Mr. Gill to take him back to his apartment. Mr. Pearson went to his apartment, while Mr. Gill remained in the truck.

Mr. Pearson returned to the truck in about five minutes. He was carrying a blanket. He opened the blanket and displayed a shotgun. Mr. Pearson pointed the shotgun at Mr. Gill and ordered him to enter the apartment. In the apartment, Mr. Pearson pointed the shotgun at Mr. Gill and on one occasion struck him with it on the side of his head. Mr. Pearson told

Mr. Gill he was going to kill him if Mr. Lucio had "ripped him off."

Mr. Pearson ordered Mr. Gill to telephone Mr. Lucio. Mr. Gill agreed, but, instead, he telephoned his wife. He told her he was in trouble and stated that he was in an apartment next door to a friend's residence. When Mr. Gill described the location of Mr. Pearson's residence, Mr. Pearson struck him in the head again.

Mr. Gill's wife agreed to call the police. Thereafter, Mr. Gill's wife called him on his cell phone. Mr. Gill pretended that he was speaking to Mr. Lucio. He stated: "He's got a gun and he wants his money back." Sometime later, Mr. Gill's wife knocked on the door. When Ms. Fresh opened the door, Mr. Pearson ran to the back of the apartment. At the same time, Mr. Gill ran out of the apartment. The police arrived as Mr. Gill ran down the stairs.

Stacey Fresh, the daughter of Mr. Pearson's live-in companion, testified that she saw Mr. Pearson walking back and forth in the kitchen with a gun in his hands on the night the police came to her apartment. She also testified that she had seen Mr. Pearson and her mother consume drugs. On one occasion she saw Mr. Pearson bring drugs into their residence.

Detective Luis Chapa, a member of the Blackfoot Police Department, testified that he interviewed Ms. Fresh and Mr. Pearson as part of his investigation of the incident that occurred in their residence on May 10, 2002, and the early morning hours of May 11, 2002. Ms. Fresh told him that she went with Mr. Pearson to the Shortstop convenience store on May 10, 2002. She informed Detective Chapa that Mr. Pearson asked Mr. Lucio if he knew where they could obtain some methamphetamine. She also stated Mr. Pearson was seeking to purchase methamphetamine for both of them. Mr. Pearson's counsel expressly waived any objection to the admissibility of Ms. Fresh's statement.

Mr. Pearson told Detective Chapa that he and Ms. Fresh decided to use the last of their cash to acquire a quantity of methamphetamine for their joint consumption. Mr. Pearson admitted that he discussed the possibility of purchasing methamphetamine with Mr. Gill and Mr. Lucio. He gave Mr. Lucio $160 for the purchase of methamphetamine.

Mr. Pearson and Ms. Fresh did not testify. Mr. Steven Hembreiker and Ms. Peggy Stebbins were the only witnesses called by the defense. Mr. Hembreiker testified that Mr. Gill told him that Mr. Gill had lied under oath in an earlier preliminary hearing about the events in Mr. Pearson's apartment to protect Mr. Lucio from being found in violation of probation for being in Blackfoot on that date.

Ms. Stebbins testified that Mr. Pearson is her son. She stated that Ms. Fresh told her that the shotgun belonged to her.

Mr. Pearson's trial commenced on May 27, 2003. After the Government rested its case-in-chief, Mr. Pearson moved for a judgment of acquittal on Counts Four and Five. The district court denied the motion. The jury found Mr. Pearson guilty on each count of the indictment. Mr. Pearson renewed his motion for a judgment of acquittal on Counts Four and Five and filed a motion for a new trial. The district court denied both motions on September 17, 2003. The court's judgment was entered on the same date. Mr. Pearson filed his timely notice of appeal on September 19, 2003. We have jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

## II

■ Mr. Pearson contends that the judgment of conviction must be reversed

because the evidence presented by the Government is insufficient to demonstrate that he attempted to possess methamphetamine with the intent to distribute it. He argues that because the evidence showed that he and Ms. Fresh attempted to purchase methamphetamine simultaneously for their joint personal use, the only crime he committed is simple possession of a controlled substance in violation of 21 U.S.C. § 844(a).

We review de novo the denial of a motion for a judgment of acquittal based on the alleged insufficiency of the evidence. *United States v. Hardy,* 289 F.3d 608, 612 (9th Cir.2002). Our review of denial of a motion for a judgment of acquittal

> is conducted in the same manner as a challenge to the sufficiency of the evidence. Thus, viewing the evidence in the light most favorable to the government, we must determine whether any rational trier of fact could have found, beyond a reasonable doubt, the requisite elements of the offense charged.

*United States v. Mendez–Casillas,* 272 F.3d 1199, 1202–03 (9th Cir.2001) (citation omitted).

 Under the law of this circuit, the sharing of drugs constitutes a distribution under 21 U.S.C. § 841(a)(1). *United States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir.1979). We held in *United States v. Wright,* 593 F.2d 105 (9th Cir.1979) that, in enacting § 841(a), "Congress intended to prevent individuals from acquiring drugs for whatever purpose on behalf of others and then transferring the drugs to those others." *Id.* at 108.

The facts in *Wright* are similar to those presented here. In *Wright,* a Government witness testified she received heroin from the appellant, and on one occasion they used it together. *Id.* at 106. The defendant testified that he received money from the Government's witness to purchase her-

oin. After he purchased the drug, he brought it back for them to share. *Id.* In *Wright,* the appellant's defense counsel offered the following instruction:

> If you find that defendant Wright acquired only a small quantity of heroin in a joint venture with[the alleged distributee] and used it with her, that evidence alone is insufficient to prove that either defendant distributed heroin and you must find them both not guilty of Count II of the Indictment. The statute charged in Count II of the Indictment is not meant to punish joint purchasers and users of a controlled substance.

*Id.*

The district court refused to give the proferred instruction. *Id.* On appeal, the appellant in *Wright* sought reversal of his conviction arguing that the district court improperly refused to instruct on the theory of his defense. *Id.* at 107. He asserted that the instruction was proper because it reflected the holding of the Second Circuit in *United States v. Swiderski,* 548 F.2d 445 (2d Cir.1977).

In *Swiderski,* the court held that

> where two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse—simple joint possession, without any intent to distribute the drug further. Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution. For the purposes of the Act they must therefore be treated as possessors for personal use rather than for further distribution.

*Id.* at 450.

In *Swiderski,* Charles Davis, a government informant, testified that Mr. Swiderski asked him to acquire a quarter pound

of cocaine for Mr. Swiderski. Two days later, Mr. Davis told Mr. Swiderski that the cocaine was available the next day. Mr. Swiderski and Maritza De Los Santos picked Mr. Davis up at a hotel and took him to an apartment. In the bedroom, Mr. Carlton Bush handed a package to Mr. Swiderski. Mr. Swiderski and Ms. De Los Santos snorted some of the cocaine and tested the contents of the package. Mr. Swiderski paid Mr. Bush $1,250 for the package and drove Mr. Davis back to his hotel. *Id.* at 448.

Mr. Swiderski and Ms. De Los Santos testified that they went to the apartment to get "high." They had not gone there to purchase cocaine. They paid Mr. Bush $1,500 "out of fear in order to be allowed to leave the premises safely." *Id.*

The district court in *Swiderski* instructed the jury that

> intent to distribute merely means that you intend at some point at a later time to pass all or some of it on. It could mean a sale; it could mean that you could give it away. *You could give it to a friend of yours or even to your fiancee. If you are going to do that, that is a distribution.*

*Id.* at 449 (emphasis in the original).

The Second Circuit reversed the judgment of conviction. It held that Mr. Swiderski and Ms. De Los Santos were only guilty of simple possession because they jointly and simultaneously acquired the drugs for their personal use. *Id.* at 450. In *Wright,* we distinguished the facts before this court from those that appeared in *Swiderski.* We held that

> Wright facilitated the transfer of the narcotic; he did not simply "simultaneously and jointly acquire possession of the drug for their [his and another's] own use." His actions exceeded the scope of the rule propounded in *Swider-*

*ski;* thus even if it is good law, about which we express no opinion, he was not entitled to the proffered instruction.

*Wright,* 593 F.2d at 108.

We held in *Wright* that the defendant "operated as the link between the person with whom he intended to share the heroin and the drug itself." *Id.* at 108. In *Swiderski,* neither defendant acted as a link because both had acquired possession of the controlled substance jointly and simultaneously from the drug supplier. The Second Circuit expressly limited its holding in *Swiderski* "to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." 548 F.2d at 450–51.

In this matter, Mr. Pearson did not attempt to acquire the methamphetamine jointly and simultaneously with Ms. Fresh when he asked Mr. Lucio and Mr. Gill if they knew where he could get some crystal methamphetamine. Ms. Fresh did not participate in making this request. Mr. Pearson and Mr. Lucio did not agree on the price to be paid until later at Mr. Pearson's residence. Mr. Pearson insisted on accompanying Mr. Gill and Mr. Lucio to purchase the methamphetamine so as not to be cheated out of the money he advanced for this purpose. Ms. Fresh did not accompany Mr. Pearson when he went with Mr. Gill and Mr. Lucio to acquire the methamphetamine. Thus, she did not solicit the purchase of methamphetamine jointly and simultaneously with Mr. Pearson. Instead, she remained passive while he actively took steps to purchase methamphetamine to share with Ms. Fresh. Had Mr. Pearson's attempt to possess the methamphetamine been successful, he would have been the link between the drug dealers and Ms. Fresh in distributing methamphetamine to her so that she could

share it with him. Accordingly, we hold that the evidence is sufficient to demonstrate that Mr. Pearson attempted to possess methamphetamine with the intent to distribute it to Ms. Fresh and share it with her.

Because the underlying drug trafficking offense alleged in Count Four of the indictment is supported by sufficient evidence, the conviction for using a firearm during a drug trafficking offense is also due to be affirmed.

AFFIRMED.